No. 2626.

## BUD REVEAL *v.* THE STATE.

THEFT—EVIDENCE—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for horse theft, because it does not overcome the presumption of innocence nor exclude the reasonable doubt.

APPEAL from the District Court of Milam. Tried before the Hon. J. N. Henderson.

This conviction was for the theft of a horse, and the penalty assessed against the defendant was a term of five years in the penitentiary.

Gordon Cook was the first witness for the State. He testified that he lived in Milam county, Texas, about three miles from the town of Buckholts, and lived at that place in 1887. His certain small bay horse disappeared from the range near that place, in the spring of 1887. That animal was branded BF on the right shoulder. The witness searched the range three days but failed to find his horse. He then employed the son of old man Strickland, from whom he bought the animal, to search the range, but he, too, failed to find him. The witness inquired of his neighbors, including each of the Bryants, but got no information about his horse. He did not ask the defendant about the animal. On one Sunday morning in the fall of 1887, one Rudy McDaniel, riding the said horse, passed the witness and John Bryant, who were traveling together. The point where McDaniel passed the witness and Bryant was about half a mile due south from witness's house. The witness claimed the horse and told McDaniel to take him to his, witness's, house. Defendant and J. L. Bryant, who were half brothers, knew witness's said horse. When witness asked J. L. Bryant if he had seen the animal, he told said Bryant that the brand was BF on the left shoulder. J. L. Bryant was now in attendance upon this court as a witness for the defendant.

Cross examined, the witness said that there was no other than the BF brand on the horse when it disappeared, so far as he knew. When McDaniel, riding the horse, passed the witness and John Bryant, the said Bryant remarked to the witness: "That is your horse." Witness, who did not observe the animal as McDaniel passed, stopped him, and, after examining the horse fully, identified it. The BF brand was still on the right shoulder, and the letters NS had been branded on the left hip. Defendant lived in Bell county. McDaniel lived on the edge of Milam county, about seven miles distant from and across the river from the defendant. The said horse was the property of the witness, and was taken from his possession in Milam county without his consent.

Floyd Bankston was the next witness for the State. He testified that he knew the animal involved in this prosecution. He saw that horse, on or about April 25, 1887, staked on a small prairie about fifty yards distant from the house of Mrs. Syl-

vester, which house was situated in Bell county, about half a mile distant from the Milam county line. Mrs. Sylvester was the mother-in-law of the defendant, and he lived at her house. While the animal was at Mrs. Sylvester's place, the witness saw the defendant brand a bar across the BF on the right shoulder, and brand the letters NS, which was Mrs. Sylvester's brand, on the left hip. There were two BF brands on the right shoulder,—one immediately above the other. Witness asked defendant why he was barring out the BF brand, and he replied that it was easier to bar it out than to run a counter brand. One of the BF brands was much dimmer than the other, but was plain enough to be seen. The witness afterwards traded with the defendant for that horse, and after that, traded it to Joel Reed. Reed subsequently traded the horse off, as he understood Reed, to John Morris. On his cross examination the witness said that, so far as he knew or could observe, the defendant, while he had the horse at Mrs. Sylvester's, made no effort to secrete him. He rode that horse about the country to the knowledge of the witness, and once, at least, put him into Mrs. Sylvester's field. When witness first found defendant in possession of the horse, the defendant, in reply to his question, told witness that he got the said horse in a trade with a man across the river. The town of Buckholts was in Milam county, north of Little river. Defendant lived in Bell county, south of Little river.

John Morris testified, for the State, that he knew the little bay horse involved in this prosecution. He saw that horse in the possession of the defendant on or about April 25, 1887, at the place where he lived, in Bell county, above a place known as the "Nigger Lease." The witness afterwards traded for that horse with Joel Reed. The horse, when witness first saw him, had the BF brands on the right shoulder—one brand being immediately above the other. The lower of the two said brands was quite plain, but the upper one was dim, and could be deciphered only at close quarters. When witness next saw him, on May 3, the BF brands had been barred out, and the letters NS branded on the left hip. When the witness first saw the horse in the possession of the defendant he told witness that he got the animal when a colt, from his uncle,—trading his uncle a yearling; that the horse soon ran away from him, and that he had just recovered him. Witness traded off the horse to Zeke Underwood. On cross examination the witness

stated that he did not, on a former trial of this case, testify that defendant told him he got the horse from "a man across the river." He did not remember whether or not he testified on that trial that defendant told him that he got the horse from his uncle. He did not think he was asked what defendant told him about how he acquired the horse.

Ned Barrett testified, for the State, that he frequently saw the Gordon Cook bay horse in defendant's possession, early in 1887. Defendant then kept him staked in a "thickety" place in Reed's pasture. He had other horses in that pasture, but did not keep them staked. A number of men worked on Reed's place and kept their horses in Reed's pasture.

The State closed.

Fayette Bryant was the first witness for the defense. He testified that he and defendant were half brothers. He knew one George May. He knew the horse involved in this prosecution. He first saw that horse about the middle of April, 1887, in the town of Buckholts, in Milam county. Some horse races were run at that town on that day. Among the large number of people who attended that race was George May. He came to the race track riding a black horse and leading the bay horse involved in this prosecution. May offered to bet the bay horse on the races. About three o'clock on that afternoon, in the presence of the witness, in the town of Buckholts, the defendant traded with May for that horse, giving him the brown pony which he rode to Buckholts, in exchange. Defendant then mounted the bay horse, and rode him home. Mack Clark and a person whom witness could not now name were present and witnessed the trade.

On his cross examination the witness said that, when acquired by the defendant, the horse was not fat, but was in very fair condition. He had no swelling on the back nor bruises on the head that witness observed. Witness did not critically observe the brown pony. He had seen the brown pony in the defendant's possession previous to the race. Defendant rode the said brown pony from his home to the horse race, spending the night before the race at the house of his half-brother, Jesse Bryant. Witness did not know where defendant got the brown horse, nor how long he owned him.

Bud Robinson testified, for the defense, that he saw the defendant and George May in attendance upon the horse race near Buckholts on the occasion referred to by the preceding

witness. May came to the race on a black horse, leading a bay pony. May attempted to bet the bay pony on the races. Failing, he took the animal back to town where he attempted to sell it to witness. Witness declined to buy, when the defendant, who was standing near, said to May: "I will give you a trade for the pony." Witness did not stay to witness the negotiation. The bay pony was in fine condition, and had no sores or bruises that the witness observed.

The defense closed.

Three witnesses testified, for the State, in rebuttal, that they knew all of the stock that the defendant owned about his home at the time of the horse race, and prior thereto. He did not then own a brown pony. He may have owned a brown pony that was kept elsewhere. Bankston, recalled for the State, testified that, when defendant brought the pony home, the said pony was very poor, had bridle bruises on its head, and a running sore on its back as large as a man's fist.

*E. L. Antony*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE.   A witness in behalf of the defendant testified positively that the defendant acquired the alleged stolen horse from one May, by trading to said May therefor a brown horse; that this occurred prior to the time when the witness for the State saw defendant in possession of the stolen horse; that May brought the said horse to a place where many people had assembled on the occasion of a horse race, and endeavored to bet the same on said race, and, failing in this endeavor, proposed to sell or trade said horse, and that defendant traded for the horse as aforesaid. There is no testimony directly assailing the credibility of said witness, or directly contradicting any of his testimony. It was corroborated to some extent by the testimony of another witness, who testified that he saw May at the race with a horse similar in description to the stolen horse, and heard May and the defendant discussing a trade about said horse.

To destroy the effect of this defensive testimony, the State proved negatively by several witnesses that they were acquainted with the property owned by the defendant, and he did not own a brown horse at the time of the alleged trade, within

their knowledge. It was also proved that on one occasion, while the defendant had possession of the stolen horse, he stated that he had got him "from a man over the river," and on another occasion he stated that he had got him "from his uncle." It is shown by the evidence that, if he got the horse from May, the first statement is true. As to the second statement, the evidence shows it to be untrue. These statements were casually made by the defendant when he did not know that he was suspected of the theft of the horse, and without his right to said horse being called in question. Having been made under such circumstances, they can not be regarded as entitled to much consideration. Their criminative force is weak—too weak to overcome the presumption of innocence, when that presumption is supported by positive evidence.

As to the negative testimony that the defendant did not own a brown horse at the time of his alleged trade with May, it is entitled to but little, if any, weight. He may have owned such a horse without the knowledge of the witnesses. He may not have owned such a horse, and yet he may have traded such a horse to May. It was incumbent on the State, we think, to meet the defendant's proof of a lawful acquisition of the stolen horse by more satisfactory evidence than was adduced. If May did not in fact trade the horse to the defendant, and did not have said horse in his possession at the race, it is reasonable to suppose that these facts could readily be established, as the race and the alleged trade took place in the county of the prosecution, and many persons were present at the time and in the town where the trade is stated to have occurred.

After a careful consideration of the evidence before us, we conclude that it does not sustain the conviction. It does not establish the guilt of the defendant to the exclusion of a reasonable doubt, in our minds, and we are unwilling to sanction the conviction upon the evidence.

The judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*